Srividya Panchalam, State Bar No. 265398
Sri.Panchalam@disabilityrightsca.org
Ben Conway, State Bar No. 246410
Ben.Conway@disabilityrightsca.org
**Disability Rights California**
350 South Bixel Street, Suite 290
Los Angeles, CA 90017
(213) 213-8000 phone
(213) 213-8001 fax

**Celia McGuinness, State Bar No. 159420**
**Steven Derby, State Bar No. 148372**
**Derby, McGuinness & Goldsmith, LLP**
200 Lakeside Drive, Suite A
Oakland, CA 94612
Telephone: (510) 987-8778
Fax: (510) 359-4419
info@dmglawfirm.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **J. Angelic Hunter, Robert Hill, Richard Packard, Donald Eblaan**, and **Lawrence Gilliam**, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>**Ronald Chatman, Matthew Love, St. Timothy's Tower & Manor, Inc., St. Timothy's Preservation LP, St. Timothy's Tower & Manor GP LLC, Levine Management Group, Inc.**, and Does 1-10, inclusive,<br><br>        Defendants. | Case No.: 18-cv-5760<br><br>**Class Action Complaint for Violations of:**<br>1.  Fair Housing Amendments Act, 42 U.S.C. § 3601 *et seq.*<br>2.  Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*<br>3.  Fair Employment & Housing Act, Cal. Gov't Code § 12900 *et seq.*<br>4.  California Government Code § 11135<br>5.  Unruh Civil Rights Act, Cal. Civil Code § 51 *et seq.*<br><br>**Demand for Jury Trial** |

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over Plaintiffs' first two claims alleging violations of federal civil rights laws. 28 U.S.C. §§ 1331 and 1343.

2. This Court has supplemental jurisdiction over Plaintiffs' State law claims because they are related to the federal claims. 28 U.S.C. § 1367.

3. This Court has personal jurisdiction and venue is appropriate in this judicial District both because all defendants are located in Los Angeles County, California, and because the acts and omissions underlying the claims in this action occurred in Los Angeles County. 28 U.S.C. § 1391(b).

## INTRODUCTION

4. Defendants, who receive millions in Federal and state funding and tax exemptions to operate housing for low-income seniors and tenants with disabilities, have violated their tenants' equal housing rights by failing to maintain the elevators that serve their apartments. Federal and State laws guarantee equal use and enjoyment of government-funded housing for tenants with disabilities, including safe, functional elevators that serve that housing. Plaintiffs are low-income seniors with mobility disabilities who live on upper levels of an eight-floor building served by two elevators. Because of their disabilities, Plaintiffs rely on the elevators to access their homes and community, and to receive emergency medical services.

5. Yet the Defendants have refused to maintain the elevators for the last two decades. As a result, in the last six months one or both of the elevators have been out of service more than 50% of the time. From 2016 through early 2018, Defendants admit there were 48 elevator outages.

6. During elevator outages, Plaintiffs and other tenants with disabilities are functionally confined to—or sometimes barred from—their upper-floor apartments. They are unable to access common amenities and to visit friends on

other floors. Several have been trapped in the elevators themselves. Some have missed critical medical appointments. Others have had to call paramedics when they became unable to continue going up stairs, trying to navigate around the elevator malfunctions.

7.      Defendants are aware of the repeated danger to which they subject their disabled tenants. Plaintiffs, other St. Timothy's tenants, and several government agencies have repeatedly notified Defendants about the elevator malfunctions and their hazardous impact upon tenants with disabilities. Yet Defendants refused for years to take the necessary steps to provide a functional elevator system.

8.      Plaintiffs bring this civil rights action on behalf of themselves and similarly situated persons to challenge Defendants' chronic, intentional failure to provide a functioning elevator system in violation of the federal Fair Housing Amendments Act, Section 504 of the Rehabilitation Act, and California laws.

9.      Plaintiffs ask this Court to ensure them access their homes and the community, equal to their able-bodied neighbors.

## PARTIES

10.     Plaintiffs are tenants of St Timothy's Tower & Manor, a HUD project-based Section 8 subsidized housing program in the city of Compton, California. Compton is in Los Angeles County, California.

11.     Defendants are the individuals and business entities that collectively own and operate St Timothy's Tower & Manor.

12.     Plaintiff J. Angelic Hunter is a 73-year-old woman with mobility disabilities that substantially limit her ability to stand, walk, and use stairs. Her home is on the eighth floor of St. Timothy's Tower. She is a qualified individual with a disability within the meaning of applicable statutes and regulations including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, 29 U.S.C. § 705(20)(B), and

California Government Code § 12926.

13.    Plaintiff Robert Hill is a 73-year-old man with cardiac disabilities that substantially limit his ability to stand, walk, and use stairs. His home is on the fifth floor of St. Timothy's Tower. He is a qualified individual with a disability within the meaning of applicable statutes and regulations including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, 29 U.S.C. § 705(20)(B), and California Government Code § 12926.

14.    Plaintiff Richard Packard is an 87-year-old man with mobility, muscular/skeletal, visual, and auditory disabilities that substantially limit his ability to stand, walk, and use stairs. His home is on the fifth floor of St. Timothy's Tower. He is a qualified individual with a disability within the meaning of applicable statutes and regulations including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, 29 U.S.C. § 705(20)(B), and California Government Code § 12926.

15.    Plaintiff Donald Eblaan is a 62-year-old man with mobility, skeletal, and spinal disabilities that substantially limit his ability to stand, walk, and use stairs. His home is on the eighth floor of St. Timothy's Tower. He is a qualified individual with a disability within the meaning of applicable statutes and regulations including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, 29 U.S.C. § 705(20)(B), and California Government Code § 12926.

16.    Plaintiff Lawrence Gilliam is a 67-year-old man with mobility and respiratory disabilities that substantially limit his ability to stand, walk, and use stairs. His home is on the fifth floor of St. Timothy's Tower. He is a qualified individual with a disability within the meaning of applicable statutes and regulations including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, 29 U.S.C. § 705(20)(B), and California Government Code § 12926.

17.    Plaintiffs are informed and believe that Defendant Ronald Chatman is either the executive director or the chief financial officer of Defendant

St. Timothy's Tower & Manor, Inc.[1] Therefore, Mr. Chatman is responsible for ensuring that St. Timothy's Tower & Manor complies with federal and State nondiscrimination laws.

18.    Defendant Matthew Love is the chief executive officer of Defendant St. Timothy's Tower & Manor, Inc. according to the California Secretary of State's filings for the corporation. Therefore, Mr. Love is responsible for ensuring that St. Timothy's Tower & Manor complies with federal and State nondiscrimination laws.

19.    Structurally St. Timothy's is comprised of three business entities: the nonprofit corporation is the sole member of the St. Timothy's limited liability corporation; in turn, the limited liability corporation is the sole partner of the St. Timothy's limited partnership.

20.    Defendant St. Timothy's Tower & Manor, Inc. is a nonprofit corporation and multifamily housing provider organized and existing under the laws of the State of California. St. Timothy's Tower & Manor, Inc., is located in Los Angeles County. Defendant St. Timothy's Tower and Manor, Inc. owns and operates the Program. It is a recipient of federal funds for its rental housing program through HUD's project based Section 8 housing program, and state financial assistance through tax-exempt multifamily affordable housing bonds through the California Statewide Communities Development Authority ("CSCDA"). This funding is sufficient to render Defendant St. Timothy's Tower & Manor, Inc. subject to Section 504 and California Government Code Section § 11135. Defendant St. Timothy's Tower & Manor, Inc. also receives Federal low-income tax credits through the California Tax Credit Allocation Committee ("TCAC"). It is a multifamily housing provider subject to the Fair Housing

---

[1] The Web site for Defendant St. Timothy's Tower & Manor, Inc., lists Mr. Chatman as executive director, but the California Secretary of State's public files for the corporation list him as the chief financial officer.

Amendments Act.

21.     Defendant St. Timothy's Preservation LP is a limited partnership and multifamily housing provider organized and existing under the laws of the State of California. St. Timothy's Preservation LP is located in Los Angeles County, California. Defendant St. Timothy's Preservation LP owns and operates St. Timothy's Tower & Manor, where Plaintiffs are tenants. It is a recipient of federal funds for its rental housing program through HUD's Section 8 housing program, and state financial assistance through tax-exempt multifamily affordable housing bonds through CSCDA. This funding is sufficient to render Defendant St. Timothy's Tower & Manor, Inc. subject to Section 504 and California Government Code Section § 11135. Defendant St. Timothy's Preservation LP also receives Federal low-income tax credits through TCAC. It is also a multifamily housing provider subject to the Fair Housing Amendments Act. Defendant St. Timothy's Tower and Manor GP LLC is a general partner of Defendant St. Timothy's Preservation LP.

22.     Defendant St. Timothy's Tower and Manor GP LLC is a limited liability corporation and multifamily housing provider organized and existing under the laws of the State of California. St. Timothy's Tower and Manor GP LLC is located in Los Angeles County. Defendant St. Timothy's Tower and Manor GP LLC owns and operates St. Timothy's Tower & Manor, where Plaintiffs are tenants. It is a recipient of federal funds for its rental housing program through HUD's Section 8 housing program, and state financial assistance through tax-exempt multifamily affordable housing bonds through CSCDA. This funding is sufficient to render Defendant St. Timothy's Tower & Manor, Inc. subject to Section 504 and California Government Code Section § 11135. Defendant St. Timothy's Tower and Manor GP LLC also receives Federal low-income tax credits through TCAC. It is also a multifamily housing provider subject to the Fair Housing Amendments Act. Defendant St. Timothy's Tower and Manor, Inc. is the

sole manager or member of St. Timothy's Tower and Manor GP LLC.

23.    Defendant Levine Management Group, Inc. ("Levine") is a for-profit corporation organized and existing under the laws of the State of California. Levine Management Group, Inc. specializes in the development, construction and professional property management of low-income affordable senior citizen and multi-family apartments. It is the contracted property manager for St. Timothy's Tower & Manor. Therefore, it is responsible for ensuring that St. Timothy's Tower & Manor complies with federal and state nondiscrimination laws.

24.    Defendants, and each of them, are sued in their own right and based on the acts of their officials, agents, partners, shareholders, board members, and employees, and each of them.

25.    At all relevant times, each of the Defendants acted as a principal, agent, representative, or employee of each of the other Defendants and acted within the course and scope of said agency, representation, or employment, and with the permission and ratification of each of the other Defendants.

26.    Plaintiffs are ignorant of the true names or capacities of those defendants named Does 1 through 10. They therefore sue said defendants by fictitious names. Plaintiffs are informed and believes that these other defendants may also be responsible for the acts and omissions claimed herein. Plaintiffs will seek leave of the Court to amend this Complaint to allege the true names and capacities of these defendants when they have been ascertained.

## FACTUAL ALLEGATIONS

27.    St. Timothy's Tower & Manor is a multifamily, senior and disabled housing program in the city of Compton, California in Los Angeles County. Because three of the defendants' names include "St. Timothy's," Plaintiffs refer to the St. Timothy's Tower & Manor housing program as the "Program."

28.    The Program consists of two buildings: the Tower and the Manor.

**Plaintiffs and other Tower tenants with disabilities need a functioning elevator system for equal use and enjoyment of their homes.**

29.   The Tower is an eight-story building. It has 112 tenant apartments housing over a hundred tenants. Of those, 105 tenant apartments are on floors two through eight. All the tenants are extremely low income or very low income, as defined by HUD. All are seniors, have disabilities, or both.

30.   Two elevators serve the Tower—a main elevator and a small elevator. The main elevator car is approximately 5 feet by 7 feet. The small elevator car is approximately 4 feet by 5 feet. 95% of the Tower's upper floor units are elevator-serviced.

31.   Plaintiffs and numerous other tenants with disabilities need to use these elevators to access their homes and the community because they have one or more disabilities that substantially limit their ability to use the stairs. These disabilities include orthopedic, physical, muscular, skeletal, visual, auditory, heart or circulatory, and/or respiratory disabilities that impair their mobility.

32.   However, these elevators have been dysfunctional for more than two decades. The elevators frequently break down, sometimes trapping residents inside. They often remain out of service for weeks at a time.

33.   On or about January 31, 2018, Defendant Levine Management Group reported to the U.S. Department of Housing and Urban Development ("HUD") that the elevators were not in operation on 48 different instances in the preceding 24 months.

34.   That dysfunction continues today. Plaintiffs are informed and believe that between September 2017 and June 2018, one or both elevators were out of service for at least 185 days:

35.   Between September 2 and 20, 2017, the main elevator went out of service four times. The main elevator was out of service for 14 of those 18 days.

36.   On September 25, 2017, both elevators went out. The main elevator

remained out of service until October 18.

37.    A week later, on October 25, 2017, both elevators went out of service. They remained out of service until late in the morning of October 27, 2017. They were functional for a few hours, then went back out of service again that afternoon. The small elevator was put back in service, but the main elevator remained out of service until November 5.

38.    The main elevator was out of service again from December 20 through 26, 2017.

39.    After just a week of operation, the main elevator was out of service again, from January 3 through February 3, 2018. During this period, the small elevator went out of service at least three times.

40.    Both elevators went out of service again on March 7, 2018. Tenants were allowed to use the main elevator again that day, but the door would only close halfway and remained inconsistent about closing for several weeks. The small elevator remained out of service.

41.    On April 5, 2018, the main elevator went out of service again for several hours. When it went back into service, it continued to malfunction for more than a week. The small elevator remained out of service.

42.    On April 13, 2018, the main elevator went out of service several times for hours. The small elevator remained out of service.

43.    On April 20, 2018, the main elevator went out of service several times over several hours. When it went back into service, it continued to malfunction. The small elevator remained out of service.

44.    On May 18, 2018, the main elevator went out of service several times over several hours. The small elevator remained out of service.

45.    Late in the day on June 14, 2018, the small elevator finally returned to service after a **ninety-nine-and-a-half day outage**.

46.    On June 19, 2018, the main elevator went out of service for several

hours. Some tenants observed smoke coming out of the elevator shaft.

**The repeated elevator outages deprive Plaintiffs of equal use and enjoyment of their homes.**

47.    Plaintiffs and numerous other tenants with disabilities live on the upper floors of the Tower.

48.    During elevator outages, Plaintiffs and other tenants with mobility disabilities face significant risks. Some of them attempt navigating up and down several flights of stairs that are unsafe for them to use because of their disabilities. Others are unable to enter or leave their homes during outages because they cannot use the stairs at all.

49.    Because of elevator outages, Plaintiffs and other tenants with mobility disabilities have missed critical medical appointments and have had to cancel personal plans. Many others have been caught outside their apartments during outages. These tenants were unable to return to their apartments for extended periods of time—denying them access to their possessions and the basic comfort of their homes:

50.    During outages, Plaintiffs and other tenants with mobility disabilities on upper floors of the Tower are unable to access services which Defendants provide on the first floor. These include the manager's office, where tenants must tender their rent, submit work orders, submit recertification paperwork, and submit reasonable accommodation requests, among other landlord-tenant business; tenant mailboxes; the community room, which houses the vending machines and game nights; Activities Committee bake sales; prayer services; free meals; monthly Food Bank donations; bi-weekly grocery donations; outdoor smoking section; and outdoor patios.

51.    Outages and service interruptions prevent Plaintiffs and other tenants with mobility disabilities on floors one through seven are unable to access the

laundry facilities that Defendants provide only on the eighth floor.

52.   Outages and service interruptions also cut off Plaintiffs and other class members from each other: They lose opportunities to socialize and build community in the Towers, which functions as their immediate neighborhood.

53.   Outages and service interruptions also cut off Plaintiffs and other tenants with mobility disabilities from the greater community. This is not simply a problem of sociability. It also endangers their tenancies, because many Plaintiffs and class members tender rent by money order they must procure in the community.

54.   Outages and service interruptions cause problems even when one elevator is in operation. Because the elevators serve 105 units on floors two through eight, when only one elevator is in operation, all tenants experience prolonged wait times to use it, up to twenty minutes. Several plaintiffs and other tenants with mobility disabilities have difficulty standing, as described below. For them, extended waits for the elevator are much more than an inconvenience: they are a painful ordeal every time they want to enter or leave their home.

55.   The extended waits also prevent several Plaintiffs and other tenants with mobility disabilities in upper floors from receiving timely in-home nursing care, in-home supportive services, and emergency care. Nurses, aides, and emergency personnel must either wait to take the single elevator or climb several flights of stairs to get to patients on upper floors. This reduces the time that service providers are actually present in-home to care for these tenants.

56.   Because the small elevator is only four feet deep by five feet wide, an ordinary wheelchair takes up most of the floor space and cannot be turned around if there is anyone else in the elevator car. Further, Defendants' staff have admonished tenants who use wheelchairs and scooters for using the small elevator. Thus, when the main elevator is out of service, tenants with large assistive devices like a power wheelchair or scooter hesitate to use the small

elevator, often rendering them trapped in their homes.

57.    The two Tower stairwells do not have the same level of access in and out of the building. Only the West stairwell can be entered and exited from the ground floor. The East stairwell only exits to the outside.

58.    The East stairwell door on the side of the building is locked from the outside. There is no door to the East Stairwell from inside the ground floor. To use the East stairwell from inside the Tower, a person would have to enter from the second floor or above. This means that if the East stairwell door were jammed at the exit for any reason when the elevators were out of service, a person exiting through the stairwells would have to go to the second floor, go across the hallway to the West stairwell, and go down to the ground floor and exit the building. For tenants with mobility disabilities, the distance is prohibitively long.

59.    Despite a decades-long history of elevator outages, Defendants have no policies or plans for addressing these outages. They do not adequately maintain the elevators to prevent outages, nor do they repair them timely.

60.    Defendants do not provide tenants consistent and/or adequate notice of the outages, including any timeframe for repair.

61.    Defendants do not provide relocation assistance for tenants during extended elevator outages.

62.    Defendants do not provide tenants reimbursement for costs incurred because of elevator outages.

63.    Defendants do not have adequate plans to provide reasonable accommodations for tenants with disabilities if the elevators are out of service.

64.    Defendants do not have adequate plans or equipment to evacuate or accommodate tenants with disabilities during medical emergencies when the elevators or out of service.

65.    Defendants do not have adequate plans in place to evacuate or accommodate tenants with disabilities in the event of natural disaster. Defendants

1  know that they serve many tenants with mobility disabilities. Yet Defendants have

2  advised tenants to walk down the stairwells to evacuate.

3                          **Plaintiff J. Angelic Hunter**

4        66.   Plaintiff J. Angelic Hunter resides on the eighth floor of the Tower.

5  She has lived there for the last six years. She intends to continue living at the

6  Tower. She enjoys the location of her eighth floor unit and its city view.

7        67.   When the elevators are functioning, Ms. Hunter leaves her home to

8  go to medical appointments. She also likes to go to the grocery store, to

9  restaurants, to museums, to the library, to bible study, to the local senior citizens

10 center for arts and crafts, to the mall with her grandchildren, to visit friends on

11 other Tower floors, and to visit first floor common room to play cards or bingo

12 with other tenants. Ms. Hunter has also enjoyed going to Long Beach on the Metro

13 Blue Line train.

14       68.   Ms. Hunter has mobility disabilities that substantially limit her

15 ability to stand, walk, and use stairs. Her mobility disabilities are due to a fused

16 spine, several related spinal surgeries, and a seizure condition. Her disabilities

17 cause her significant pain, difficulty, and balance problems that put her at risk of

18 falling when she stands or attempts to walk. Ms. Hunter has had several falls in

19 the past few months while attempting to stand or walk, even with her walker. She

20 has also been hospitalized several times in the past few months.

21       69.   Ms. Hunter cannot walk without assistance. Her recent health

22 complications have further compromised her ability to walk, and she experiences

23 more pain.

24       70.   Ms. Hunter uses a power scooter for most of her ambulation.

25       71.   Ms. Hunter sometimes uses a walker to support her while walking.

26 With her walker, walking is slow and difficult for her, she has limited stability,

27 and can only walk a limited distance.

28       72.   Ms. Hunter cannot stand without assistance for more than a few

1  moments—for example the time it takes her to move from her scooter to a chair.
2  She uses a walker to support her while standing. She often also sits in her scooter
3  if she has to wait in place.

4      73.   Ms. Hunter cannot use stairs. She attempted use the stairs once from
5  the ground floor up to her eighth floor home in the past few years when both
6  elevators were out of service. She slipped and fell near the fifth floor, injuring
7  herself. She was hurt and embarrassed. Ms. Hunter was very sore the next day and
8  could hardly stand. It became impossible for her to use stairs after this incident.

9      74.   Because she cannot use the stairs, Ms. Hunter is terrified about how
10  she will get of the building if a medical emergency or natural disaster occurs when
11  the elevators are out of service. Defendants have never informed her of any
12  emergency or natural disaster planning for the Program.

13     75.   With the prolonged elevator outages with no real response from
14  management or help from management, tenants such as Ms. Hunter have been
15  forced to fend for themselves considering creative but sometimes unsafe
16  alternatives to get up and down stairs. For example, one tenant suggested to
17  Ms. Hunter that she slide down the stairs in an empty box from the eighth floor.
18  But she could not physically do that even if it was safe. She is considering purchase
19  of mountain climbing ropes so she can hoist herself down the side of the Tower
20  through her window.

21     76.   Ms. Hunter has missed critical medical appointments and ACCESS
22  paratransit rides because elevator outages have stranded her in her home. For
23  example, on October 25, 2017, she missed an appointment with her cardiologist
24  because the elevators did not work. Ms. Hunter also missed the ACCESS ride that
25  was supposed to take her to the cardiologist appointment, risking a negative mark
26  on her ACCESS ride record and eventual cancellation if she misses too many rides.

27     77.   Ms. Hunter needs a functional elevator system because her
28  disabilities make it impossible for her to access her home on the eighth floor by the

1  stairs. She especially needs to use the main elevator to accommodate her power

2  scooter, which she needs to access the community and increasingly, the Program

3  itself. When the main elevator is out, the small elevator is "packed like sardines"

4  by the time it reaches the eighth floor and there is no room for the power scooter

5  she needs to ambulate. She often waits several trips for the small elevator to empty

6  so she has room to get inside with her power scooter. The small elevator also

7  strains to operate and makes alarming noise while transporting her in her power

8  scooter.

9      78.    On or about December 31, 2017, Ms. Hunter experienced a medical

10  emergency requiring an ambulance and hospitalization, when the freight elevator

11  was out of service. The responding Compton Fire Department personnel struggled

12  to transport her gurney in the small elevator for lack of space, and expressed

13  frustration that the main elevator was out of service.

14      79.    Ms. Hunter needs a functioning elevator system to receive disability-

15  related care and assistance from her son and her in-home supportive services

16  ("IHSS") worker. Her son also has mobility disabilities that make it difficult for

17  him to use stairs. Even if one elevator is in service, the long wait times cause him

18  significant pain while standing. Ms. Hunter also suffers delays in getting full and

19  timely care from her IHSS worker because of elevator outages. It takes a long time

20  for her worker to climb the eight flights of stairs or wait to take the one

21  operational elevator.

22      **Plaintiff Robert Hill**

23      80.    Robert Hill resides on the fifth floor of the Tower. He has lived there

24  for the last five years and intends to continue living there.

25      81.    When the elevators are functioning, Mr. Hill regularly leaves his

26  apartment to go to medical appointments, to the grocery store, to the mall, to

27  restaurants, to get money orders for paying his rent at the manager's office on the

28  first floor, to get mail right outside the first floor, to do his laundry on the eighth

floor, to spend time with his girlfriend and friends, and to travel.

82. Mr. Hill has cardiac disabilities that substantially limit his ability to stand, walk, and use stairs. Mr. Hill has undergone multiple heart surgeries. He has a pacemaker.

83. Mr. Hill cannot walk without support outside of his home. He uses a cane or walker whenever he leaves his home.

84. Mr. Hill can walk short distances with his cane. When he goes beyond the Program's gates, he uses a walker for better stability.

85. Mr. Hill can stand, but standing still for more than a few moments causes him severe pain and dizziness.

86. Mr. Hill can nominally use stairs with great difficulty. To use the stairs, Mr. Hill can only bring his cane—his walker is too heavy for him to bring on the stairs. Even with the cane, Mr. Hill can only use stairs very slowly and worries about falling. He needs a break at every landing because of pain, weakness in his legs, fatigue, and shortness of breath. However, there is nowhere to rest in the stairwells. He has to stand and lean against a wall, or hold himself against the railing until he feels he can proceed. If he sits on the stairs, it can be hard for him to get back up again. When he looks down the stairs, sometimes he experiences dizziness.

87. If both the elevators are out of service, Mr. Hill does not attempt to go down the stairs because he is unsure whether he will be able to make it back up the stairs to the fifth floor. He stays inside his unit until at least one elevator is working.

88. Mr. Hill is worried about whether he will be able to evacuate down the Tower stairs fast enough in the event of a medical emergency or natural disaster if the elevators are out of service. Defendants have never informed him of any emergency or natural disaster planning for the Program. He does not know a safe way for him to get out of the building on his own.

89.    On October 25, 2017, Mr. Hill was trapped in the main elevator with another tenant with disabilities when it malfunctioned. Mr. Hill was terrified and panicked. Because of his cardiac disabilities, Mr. Hill experienced heart palpitations and breathing problems, became dizzy, and nearly lost consciousness. Mr. Hill fears being trapped in the elevators again.

90.    When one elevator is down, it is very difficult for Mr. Hill to leave his home. It can take up to twenty minutes just to get the elevator and he experiences a difficult time standing during that time. The ride itself has taken up to four minutes to go from the fifth floor to the ground floor.

**Plaintiff Richard Packard**

91.    Richard Packard resides on the fifth floor of the Tower. He has lived there for the last six years and intends to continue living there.

92.    When the elevators are functioning, Mr. Packard regularly leaves his apartment to go to medical appointments, to get meals in the community, and to sit on the bench outside St. Timothy's gates. He also likes to visit his friends and neighbors on other floors of the Tower many times a day.

93.    Mr. Packard has muscular/skeletal, visual, and auditory disabilities that substantially impair his ability to stand, walk, and use stairs. He has severe knee arthritis that causes significant pain is knees and legs. He has a permanent rod in his left arm. His left arm is about three inches shorter than his right arm and very weak. He is legally blind: he has complete blindness in one eye and glaucoma that limits his field of vision and compromises his depth perception by approximately ninety percent in his remaining eye. His vision has progressively worsened over the years. He has hearing problems that limit his awareness of his environment. He has cardiac conditions, and had a stent surgically inserted into his heart.

94.    Mr. Packard also takes a blood thinner medication to help him avoid strokes. Because of this medication, ordinary bumps and bruises can become life

1  threatening because he is likely to get internal bleeding from them.

2     95.   Mr. Packard cannot stand, walk, or use stairs without support. He is

3  always at risk of falling.

4     96.   Mr. Packard uses a cane for support while standing, walking, or using

5  stairs. He has to use the cane in his right arm for the best balance. Because of the

6  rod in his left arm and its shortness, he cannot properly use the cane with his left

7  hand.

8     97.   Mr. Packard cannot stand for more than about fifteen minutes at a

9  time even with his cane. After that, his legs may give out from the severe arthritis

10  in both his knees.

11     98.   Mr. Packard can slowly walk on flat ground almost one city block

12  with the support of his cane. Further than that, he risks his legs giving out.

13     99.   Mr. Packard's physician has directed him never to take the stairs. His

14  disabilities make it likely that he will suffer serious injury.

15     100.  Because of his vision impairments, Mr. Packard cannot consistently

16  see the steps. Because of his leg and back issues, going up and down the steps is

17  painful. Because of his arm issues, he cannot properly support himself on the rail to

18  compensate for his leg and back issues. There is only a single railing in each of the

19  two Tower stairwells. Going up the stairs, he has to use his weak and short left

20  arm to balance his cane on the stairs and use his right arm to hold the rail. Going

21  down the stairs, he has to use his weak and short left arm to hold the rail and use

22  his right arm to balance his cane on the stairs.

23     101.  Despite doctor's orders, Mr. Packard has risked taking the stairs from

24  the ground floor to his fifth floor home about four to six times when both elevators

25  went out of service while he was out of the building. To use the stairs, he had to

26  hold onto the rail, pull himself up a step or two at a time, let go of the rail, and

27  hope that he would catch the rail again as he fell forward to the next step. Each of

28  the times he took the stairs, he repeated this process every two steps for five

stories. He almost fell several times and risked serious physical harm. He did not fall because, in his view, he has "always been lucky."

102. Mr. Packard fears being stranded in the Tower or the community because of elevator outages. He also worries about whether he will be able to evacuate the Tower down the stairs in a medical emergency or natural disaster if the elevators are out of service. Defendants have never informed him of any emergency or natural disaster planning for the Program.

103. Mr. Packard has missed critical medical appointments and canceled plans because elevator outages have stranded him in his unit. He was forced to cancel a medical appointment with his primary care physician during elevator outages on March 7, 2018.

104. Mr. Packard usually eats his meals in the community because his disabilities prevent him from cooking for himself. When the elevators go out, he often goes twenty-four hours without eating in the hopes that the elevators will resume service.

105. Mr. Packard suffers significant delays in receiving timely IHSS services when the elevators are out of service. He receives IHSS because he cannot do many tasks of daily living because of his disabilities, such as his laundry, getting his mail, and cleaning his home. When one or both elevators are out, it takes his IHSS worker a long time to take the stairs or use the single elevator to get to him on the eighth floor to help him.

106. Mr. Packard wants to get a walker and a power scooter to assist him with his significant mobility needs. However, he is worried that he will not be able to use them in the Tower because the frequent elevator outages would make it difficult to bring either of those devices from the ground floor to his home and back.

107. Defendants do not communicate elevator outage notices in a format accessible to Mr. Packard's visual impairments, if they post any at all. Any outage

notice needs to be in large print for Mr. Packard to be able to read it. He has requested that Defendants provide him large print documents as a reasonable accommodation several times in the past few months, but they have refused. Defendants have never called him, or otherwise tried to let him know about elevator outages. Mr. Packard only finds out that one or more of the elevators are out of service because other tenants tell him.

### Plaintiff Donald Eblaan

108.  Donald Eblaan resides on the eighth floor of the Tower. He has lived there for the last six years and intends to continue living there.

109.  When the elevators are functioning, Mr. Eblaan regularly leaves his apartment to go to medical appointments, to the grocery store, to visit other tenants' units, to the bank to get money orders to pay his rent or for other banking purposes, to manager's office on the first floor to pay his rent, and to the vending machines and mailboxes on the first floor. Mr. Eblaan also often helps other tenants with their medical needs, with getting groceries, with transportation to medical appointments, and with picking up prescriptions. He also enjoys driving around the community and visiting friends in Long Beach.

110.  Mr. Eblaan has mobility, skeletal, and spinal disabilities that substantially limit his ability to stand, walk, and use stairs.

111.  Mr. Eblaan has avascular necrosis, a degenerative skeletal disorder that progressively deteriorates his bones. This condition has necessitated several hip and shoulder replacements and deteriorated his knees. His left shoulder is worse than his right. It never quite healed after doctors installed the artificial shoulder. His artificial hips are now about nineteen years old and will be replaced in the near future.

112.  Mr. Eblaan also has spinal damage that has required surgery and medical procedures. Doctors fused Mr. Eblaan's fifth lumbar and first sacral vertebrae in 2009; this procedure is sometimes called an L5-S1 fusion. Since that

1  fusion, he has had limited feeling in his left foot, which cause balance challenges

2  for him.

3       113.   Mr. Eblaan also has severe bronchial asthma, for which he has been in

4  treatment since he was four years old. He has three different inhalers to treat his

5  asthma. He takes two on a regular basis and one in emergencies. He see the

6  doctors for my asthma about every three weeks.

7       114.   Mr. Eblaan's asthma can flare up when he physically exerts himself

8  too much. He starts panting and wheezing, and it becomes hard for him to

9  breathe. He has to stop and rest wherever he is, and use his emergency inhaler to

10  try to re-open his bronchial tubes. His asthma can get even worse when he is sick,

11  prompting immediate medical attention. While sick, a bronchial asthma attack

12  causes thick mucus to build in his chest and it becomes extremely hard for him to

13  breathe. If he does not get immediate medical treatment, he can get serious

14  pneumonia. When he is sick and experiencing asthma, he is too weak to walk, let

15  alone use the stairs.

16       115.   Mr. Eblaan is only able to stand for a few moments at a time. After

17  that, pain starts as pressure across his lower back and hips and builds to

18  excruciating pain within minutes.

19       116.   Mr. Eblaan is intermittently able to walk. When his hips, femurs,

20  knees, and back are stable, then he is able to walk on flat surfaces. When the pain

21  in one or more of those areas flares up, then he is limited in his walking and

22  occasionally unable to get out of bed.

23       117.   Mr. Eblaan cannot functionally use the stairs going up. When he

24  attempts to walk up stairs, he feels a stabbing pain in both knees. Walking up the

25  stairs always triggers his knee issues. To take pressure off his knees as much as

26  possible, he holds onto the railing with his right hand and pull himself up each

27  step. He has walked up one or two flights from time to time like this, but "eight is

28  a killer."

118.  Going up the stairs is even more difficult for Mr. Eblaan if he is carrying bags or packages. On flat ground, he carries bags or packages in both hands to balance the pressure on his shoulders, spine, and hips. To go up the stairs carrying bags or packages, he has to put all of the bags in his left hand so he can pull himself up the railing using his right hand. This puts a lot of pressure on his left shoulder and also throws off his balance.

119.  Mr. Eblaan will only walk down stairs if he has no other choice. Repeated use of the stairs going down puts wear and tear on his artificial hips and spine. He goes out of the building three to eight times a day. Having to go down the stairs multiple times a day would aggravate his disabilities.

120.  When one of the elevators is out, Mr. Eblaan is forced to wait up to a half hour for the elevator to arrive at his eighth-floor home. During these waits, he does his best to pace because he cannot stand that long and there is nowhere to sit by the elevator landing on the eighth floor.

121.  Mr. Eblaan was trapped in the main elevator twice in the same day, October 25, 2017. Darren, a maintenance worker for the Program, eventually forced the door open and helped Mr. Eblaan out. Mr. Eblaan fears being trapped in the elevators again.

122.  Mr. Eblaan worries about whether he will be able to evacuate the Tower down the stairs in a medical emergency or natural disaster if the elevators are out of service. Defendants have never informed him of any emergency or natural disaster planning for the Program other than taking the stairwells. Sometime in 2011, after getting some information from the library, Mr. Eblaan talked to Defendants' on-site manager Dwayne Ennis about the need to have an evacuation plan for the Program in case of natural disaster. During elevator outages in March 2018, Mr. Eblaan asked Mr. Ennis again about evacuation plans for the building. As of the filing of this complaint, Mr. Eblaan has never heard back from Mr. Ennis about any plans.

**Plaintiff Lawrence Gilliam**

123.  Lawrence Gilliam resides on the fifth floor of the Tower. He has lived there for almost three years and intends to continue living there.

124.  When the elevators are functioning, Mr. Gilliam regularly leaves his apartment to go to medical appointments, to the grocery store, to get a money order in the community, to pay his rent at the manager's office on the first floor, to do his laundry on the eighth floor or at a local laundromat, to get his mail right outside the ground floor, and to visit family in Los Angeles. Sometimes, Mr. Gilliam likes to go to the park, to the library, to the donut shop, or to get meals in the community. He also like to spend time in the Tower's community room or outdoor patios on the first floor, listening to music or chatting with other tenants.

125.  Mr. Gilliam also helps many Tower seniors older than him to get groceries, to run errands, or to help them get in and out of the building with their things.

126.  Mr. Gilliam has mobility and respiratory disabilities that substantially limit his ability stand, walk, and use stairs. He has torn rotator cuffs and significant lower back problems. He has chronic obstructive pulmonary disease (COPD), asthma, bronchitis, and emphysema, which cause him breathing problems. He cannot physically exert himself too much without aggravating his health conditions.

127.  Mr. Gilliam uses a cane, walker, and/or a back brace to support himself while walking, standing, or using stairs. He carries an asthma inhaler with him at all times to help with his breathing problems, which get worse with exertion.

128.  Mr. Gilliam can stand for a limited time with the assistance of his cane or walker. He experiences pain when he has to stand for more than a few minutes at a time, even with support.

129.  Mr. Gilliam cannot walk very far without support, even on flat surfaces. With his back brace and his walker or cane, he can walk a single city block on a good day. On a bad day, for example, when he is having a lot of back pain, he can barely walk to corner of the street from the Tower.

130.  Mr. Gilliam cannot functionally navigate more than one half-flight of stairs going up. After that, he experiences pain, shortness of breath, and dizziness. Although both are difficult for him, going up the stairs is much harder for him than going down the stairs.

131.  During elevator outages, Mr. Gilliam has often waited in his home until the elevators are back in service. He cannot guarantee that he will be able to make it back up the stairs if he goes down the stairs when the elevators are out.

132.  During at least one elevator outage in the past year, Mr. Gilliam had to call 911 while going up the stairs. He was trying to go up the stairs from the first floor to his fifth floor home, but could not make it up the stairs past the second floor. Mr. Gilliam had trouble breathing, severe fatigue, and could not proceed. He called 911 after using his inhaler did not help. He waited seated on the landing, disoriented, short of breath, drained, claustrophobic, and barely able to move. Emergency personnel put him in a chair and carried him up to the stairs into his apartment.

133.  When only one elevator is working, Mr. Gilliam has waited fifteen minutes or more for the elevator to arrive. Because of his disabilities, he experiences pain and fatigue while waiting for the elevator, especially if he is returning after physically exerting himself from running errands or going to the doctor's office.

134.  Mr. Gilliam fears being trapped in the elevator during an outage and how it will affect his health. He also worries about whether he will be able to evacuate the Tower down the stairs in a medical emergency or natural disaster if the elevators are out of service. Defendants have never informed him of any

1   emergency or natural disaster planning for the Program other than exiting through

2   the stairwells.

3       135.  In late April 2018, a house fire on the sixth floor caused tenants to

4   have to evacuate their units. The next morning or the morning after, Mr. Gilliam

5   asked Defendants' on-site manager Mr. Ennis whether there were any emergency

6   procedures in place because he and other tenants were panicked and confused

7   about what to do to keep themselves safe. As of the date of this complaint, Mr.

8   Gilliam has not heard back from Mr. Ennis about any plans.

9

10   **St. Timothy's Tower & Manor is a Federal and State funded housing**

11   **program for low-income seniors and/or individuals with disabilities.**

12       136.  The Tower has 114 residential units. Two units are occupied by

13   building managers, and the other 112 units are subsidized through Project Based

14   Section 8 funds and low-income tax credits.

15       137.  The Program receives federal financial assistance from the United

16   States Department of Housing and Urban Development (HUD) including Project

17   Based Section 8, state financial assistance, and federal low-income tax credits.

18       138.  Defendants renewed their Project Based Section 8 contracts for the

19   Program with HUD in 2016 for the next 20 years. The Program received $777,520

20   in federal funding for the first fiscal year of that contract and continues to receive

21   federal funding.

22       139.  The Program received $17,150,000 in tax-exempt multifamily

23   affordable housing bonds from the State of California.

24

25

26

27

28

**Defendants spent millions of dollars to renovate the Program, but did not fix the elevators.**

140.  The Program's elevators are over sixty years old.

141.  From 2015 to 2017, Defendants spent approximately four million dollars renovating St. Timothy's Tower & Manor.

142.  In applying for—and eventually obtaining—three quarters of a million dollars in Federal low-income tax credits from TCAC, Defendants reported that they were "in the process of upgrading the entire facility." These renovations reportedly included elevator rehabilitation.

143.  In January 2018, Defendants represented to HUD that they had performed a "complete rehabilitation" of the elevators.

144.  But Defendants did not and instead continue to rely upon an elevator service company to address malfunctions after they occur with band-aid type repairs that do not last and with no real program of preventative maintenance.

**Defendants' refusal to maintain a functional elevator system has also deprived numerous other tenants with disabilities from equal use and enjoyment of their homes.**

145.  Plaintiffs interact with many of their neighbors in the Tower. Based on these interactions, Plaintiffs are informed and believe that there are at least fifty tenants with mobility disabilities in the building who are adversely affected by Defendants' refusal to maintain a functional elevator system.

146.  Because of their disabilities, these other tenants with disabilities cannot walk or have extremely limited walking ability even with an assistive device. Even those who can access stairs in some manner are at significant risk of falling while using stairs.

147.  Many of these other tenants with disabilities use manual or power wheelchairs, power scooters, walkers, canes, and/or other assistive devices for

their mobility needs.

**Defendants refuse to ensure a functional elevator system despite two decades of frequent elevator outages.**

148. Both Tower elevators have experienced repeated outages over the last two decades, preventing Plaintiffs and other tenants with mobility disabilities from accessing their homes, and threatening their lives and safety.

149. Plaintiffs and several government agencies have repeatedly attempted to address the elevator outages with Defendants. Their efforts were unsuccessful.

150. The Compton Fire Department has expressed concerns about these repeated outages to Defendants since at least 1994.

151. The Fire Department needs the Tower elevators to be operable when responding to tenant medical emergencies. Only the main elevator can transport a tenant in a medical gurney in a flat, safe position. When that main elevator is out, first responders have no choice but to cram critically ill or injured tenants in the small elevator if it is in operation, manually carry them down the stairs, or transport them down the stairs on gurneys one floor at a time. These inadequate options compromise their administration of medical care.

152. On January 13, 1994, following a three-month main elevator outage, the Fire Department issued a "Notice of Violation," requesting prompt repair of the main elevator because it is "often called to the facility to aid tenants in life-threatening situations" where they "frequently have to use advanced life-support which also includes C.P.R. in treating patients." The small elevator "due to its size cannot accommodate [the Fire Department] in maintaining continued life support work on [the] victim and time from some floors to the lobby in it exceeds the established standard of thirty seconds (the time allowed for cessation of C.P.R. purposes)."

153. On December 19, 2016, the Fire Department issued a "Notice of

Violation" and "Stop Work Order" when both elevators went out of service for nearly a month. The Fire Department notice asked that Defendants repair the inoperable elevators "immediately" citing "threats to life safety" that violated the Compton Fire Code.

154. On October 25, 2017, the Fire Department ordered Defendants to "repair elevator to full working order" after Plaintiff Hill and another tenant were trapped in the main elevator.

155. On June 14, 2017, Senior Deputy Michelle Chambers of Assemblyperson Mike Gipson's office met with Defendant Ronald Chatman to raise several problems affecting St. Timothy's tenants, including elevator outages. She reported that Defendant Mr. Chatman "was extremely rude, standoffish and said if the residents didn't like the condition of the property, they could move."

156. Before filing this Complaint, on November 30, 2017, Plaintiffs, through their attorneys, sent a letter informing Defendants of their legal obligations to maintain operational elevators. Defendants did not respond to that letter.

157. Following more elevator outages, Plaintiffs, through their attorneys, sent Defendants a demand letter on December 30, 2017. Defendants did not respond to that letter.

158. Plaintiffs sent Defendants follow-up letters on January 11 and 12, 2018.

159. Defendants finally responded on January 12, 2018, but did not address Plaintiffs' concerns.

160. On January 24, 2018, several Plaintiffs, through their attorneys, filed a request for assistance with Congresswoman Nanette Diaz Barragan's office, which resulted in a congressional inquiry with HUD.

161. On January 30, 2018, several Plaintiffs, through their attorneys, filed an administrative complaint with the Compton Fire Department.

162. From late January to early March 2018, Plaintiffs attempted to

1  negotiate a resolution with Defendants, through their respective counsel.

2  Defendants claimed they would review Plaintiffs' proposal for resolution, but

3  never engaged in any resolution discussions.

4       163.  Defendants still refuse to ensure a functional elevator system.

5       164.  Thus, Plaintiffs now ask this Court to order Defendants to maintain a

6  functional elevator system for the Program, and to implement lawful reasonable

7  accommodation policies, notice policies, and emergency evacuation policies, to

8  ensure that Plaintiffs and others similarly situated have equal access to their

9  housing when the elevators go out of service.

10

11  ## RULE 23(B)(2) CLASS ALLEGATIONS

12       165.  Plaintiffs bring this action on behalf of themselves and all other

13  similarly situated people pursuant to Federal Rule of Civil Procedure 23(b)(2).

14       166.  The class includes all current and future tenants of the Tower who

15  have disabilities that affect their mobility and were, are, or will be denied equal use

16  and enjoyment of their housing because of Defendants' failure to maintain a

17  functioning elevator system, and failure to implement lawful reasonable

18  accommodation policies, notice policies, and emergency evacuation policies, to

19  ensure that Plaintiffs and others similarly situated have equal access to their

20  housing when the elevators go out of service.

21       167.  The class is so numerous that joinder is impracticable. Plaintiffs know

22  that there are approximately one hundred tenants in the upper floors of the

23  Tower. Based on their interactions with their neighbors in the Program, Plaintiffs

24  believe that the proposed class includes at least fifty members.

25       168.  In addition to pure numerosity, joinder is further impracticable

26  because many tenants are unwilling to sue individually for fear of retaliation.

27  Plaintiffs believe this based on conversations with their neighbors in which those

28  neighbors have expressed exactly this fear.

169.  The class presents common questions of law and fact that are capable of class-wide resolution. These questions are all founded on the central question of whether Defendants have violated federal and state laws by failing to maintain a functioning elevator system. The Court can resolve the class' issues in one stroke.

170.  Plaintiffs' claims are typical of those of the class at large and Defendants' anticipated defenses will be typical for the entire class. Each of the named Plaintiffs is a current tenant of the Program who has disabilities that affect their mobility and were or will be denied equal use and enjoyment of their housing because of Defendants' failure to maintain a functioning elevator system failure to implement lawful policies as described above

171.  Plaintiffs will fairly and adequately protect the interests of the class as they are unified in their desire for a functioning elevator system and there is no conflict with any other class member. Plaintiffs have retained counsel to represent the Class who are experienced in class action litigation.

172.  Defendants' failure or refusal to maintain a functioning elevator system and failure to implement lawful policies as described above has applied generally to the Class such that final injunctive and declaratory relief is appropriate for the Class as a whole.

## FIRST CLAIM: VIOLATIONS OF FAIR HOUSING AMENDMENTS ACT, 42 U.S.C. § 3601 *ET SEQ.*

173.  Plaintiffs incorporate by reference the preceding paragraphs.

174.  Plaintiffs plead this claim against all Defendants.

175.  The federal Fair Housing Amendments Act (FHAA) makes it unlawful for a housing provider "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter, a person residing in or intending to resident in that dwelling after it is sold, rented, or made available; or any person associated

1    with that buyer or renter." 42 U.S.C. § 3604(f)(1); 24 C.F.R. § 100.202(a).

2         176.  It is also unlawful under the FHAA "[t]o discriminate against any

3    person in the terms, conditions, or privileges of sale or rental of a dwelling, or in

4    the provision of services or facilities in connection with such dwelling, because of

5    a handicap of that person; or a person residing in or intending to reside in that

6    dwelling after it is sold or made available; or any person associated with that

7    person." 42 U.S.C. § 3604(f)(2); 24 C.F.R. § 100.202(b).

8         177.  Discrimination under the FHAA includes "a refusal to make

9    reasonable accommodations in rules, policies, practices, or services, when such

10   accommodations may be necessary to afford such person equal opportunity to use

11   and enjoy a dwelling." 42 U.S.C. § 3604(3)(B); 24 C.F.R. § 100.204(a).

12        178.  Discrimination under the FHAA also includes "[f]ailing or delaying

13   maintenance or repairs of sale or rental dwellings because of …handicap." 24 C.F.R.

14   § 100.65(b)(2).

15        179.  Defendants are multifamily housing providers subject to the FHAA.

16        180.  Plaintiffs are qualified individuals with disabilities within the

17   meaning of FHAA.

18        181.  Defendants' actions and omissions discriminate against Plaintiffs

19   solely because of their disability in violation of the FHAA. Defendants'

20   discriminatory conduct includes but is not limited to failure to accommodate

21   Plaintiffs by maintaining operable elevators, otherwise failing or delaying

22   maintenance and repairs of the elevators, failing to implement lawful reasonable

23   accommodation policies, notice policies, and emergency evacuation policies, to

24   ensure that Plaintiffs and others similarly situated have equal access to their

25   housing when the elevators go out of service, and requiring Plaintiffs to use the

26   stairs if the elevators are out of service. Defendants' violations of the FHAA have

27   harmed and will continue to harm Plaintiffs in the future.

28        182.  Because Defendants' discriminatory and wrongful conduct is ongoing,

1    declaratory and injunctive relief are appropriate remedies.

2    183.  Plaintiffs seeks injunctive relief, and attorney's fees, costs and

3    litigation expenses to address these violations.

4

5    SECOND CLAIM: VIOLATION OF SECTION 504 OF THE REHABILITATION

6    ACT, 29 U.S.C. § 794 *ET SEQ.*

7    184.  Plaintiffs incorporate by reference the preceding paragraphs.

8    185.  Plaintiffs plead this claim against the "Business Defendants," namely:

9    Defendants St. Timothy's Tower & Manor, Inc., St. Timothy's Preservation LP,

10   St. Timothy's Tower and Manor GP LLC, and Levine Management Group, Inc.

11   186.  Section 504 of the Rehabilitation Act of 1973 provides in relevant

12   part: "[N]o otherwise qualified individual with a disability shall, solely by reason

13   of her or his disability, be excluded from the participation in, be denied the

14   benefits of, or be subjected to discrimination under any program or activity

15   receiving federal financial assistance" 29 U.S.C. § 794; 24 C.F.R. § 8.4(a). Such

16   programs and activities are prohibited from discriminating against qualified

17   individuals with disabilities because a "recipient's facilities are inaccessible to or

18   unusable by individuals with handicaps." *see* 24 C.F.R. § 8.20.

19   187.  In relevant part, Section 504 requires covered programs to: refrain

20   from disability discrimination, ensure program access, provide participants with

21   reasonable accommodations, refrain from utilizing discriminatory criteria or

22   methods of administration, and account for accessibility in alterations to housing

23   facilities.

24   188.  **Discrimination prohibited.** Defendants may not in providing any

25   housing, aid, benefit, or service of St. Timothy's directly or through contractual,

26   licensing, or other arrangements, solely on the basis of disability:

27   a.    "Deny a qualified individual with handicaps the opportunity to

28         participate in, or benefit from, the housing, aid, benefit, or

service." 24 C.F.R. § 8.4(b)(1)(i).

b.    Provide a qualified individual with handicaps with any housing, aid, benefit, or service that is not as effective in affording the individual an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 24 C.F.R. § 8.4(b)(1)(iii).

c.    "Aid or perpetuate discrimination against a qualified individual with handicaps by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any housing, aid, benefit, or service to beneficiaries in the recipient's federally assisted program or activity." 24 C.F.R. § 8.4(b)(1)(v).

189.    **Program access.** Each Defendant must "operate each existing housing program or activity receiving Federal financial assistance so that the program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with handicaps." 24 C.F.R. § 8.24(a). A recipient may comply with the requirements of this section through such means as "alteration of existing facilities and construction of new facilities, or any other methods that results in making its programs or activities readily accessible and usable by individuals with handicaps." 24 C.F.R. § 8.24(b). Housing receiving HUD Project Based Section 8 must "comply with program accessibility requirements of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and implementing regulations at 24 CFR part 8." 24 C.F.R. § 983.102.

190.    **Building alterations.** For substantial alterations, Defendants must ensure that a project meets new construction standards for housing facilities "if alterations are undertaken to a project ... that has or more units and the cost of alterations is 75 percent or more of the replacement cost of the completed facility,"

1    24 C.F.R. §§ 8.23, 8.22.

2        191.  For all other alterations, Defendants must ensure that "alterations to

3    dwelling units in a multifamily housing project…shall to the maximum extent

4    feasible, be made to be readily accessible to and usably by individuals with

5    handicaps." 24 C.F.R. §8.22(b)(1). Defendants must also ensure that "alterations to

6    common areas or parts of facilities that affect accessibility of existing housing

7    facilities shall, to the maximum extent feasible, be made to be accessible to and

8    usable by individuals with handicaps." 24 C.F.R. §8.22(b)(1).

9        192.  **Methods of Administration.** Defendants may not in directly or

10    through contractual or other arrangements, "utilize criteria or methods of

11    administration" the purpose or effect of which would:

12            a.     "Subject qualified individuals with handicaps to discrimination

13                   solely on the basis of handicap." 24 C.F.R. § 8.4(b)(4)(i).

14            b.     "Defeat or substantially impair the accomplishment of the

15                   objectives of the recipient's federally assisted program or

16                   activity for qualified individuals with a particular handicap

17                   involved in the program or activity, unless the recipient can

18                   demonstrate that the criteria or methods of administration are

19                   manifestly related to the accomplishment of an objective of a

20                   program or activity." 24 C.F.R. § 8.4(ii).

21            c.     "Perpetuate the discrimination of another recipient if both

22                   recipients are subject to common administrative control…"

23                   24 C.F.R. § 8.4(iii).

24        193.   Each Business Defendant has been and is a recipient of federal

25    financial assistance sufficient to invoke the coverage of Section 504. These federal

26    funds include HUD Project Based Section 8 funds.

27        194.  Plaintiffs have been and are qualified individuals with disabilities

28    within the meaning of Section 504 and are otherwise qualified to participate in or

1  receive benefits from Business Defendants' programs or activities. 29 U.S.C.

2  § 794(b).

3       195.  The Program, including its housing and other benefits, activities, and

4  services are a program, service or activity that Business Defendants offer within

5  the meaning of Section 504.

6       196.  Business Defendants caused a substantial alteration to the Program—

7  costing approximately four million dollars—between 2015 and 2017, including

8  alterations to the elevators unrelated to function andalterations in the paths of

9  travel and common areas served by elevators.

10       197.  Business Defendants' actions and omissions discriminate against

11  Plaintiffs solely by reason of their disability in violation of Section 504. Business

12  Defendants' discriminatory conduct includes but is not limited to a denying

13  Plaintiffs' meaningful access to housing by failing to maintain operable elevators.

14       198.  Business Defendants' violations of Section 504 have harmed and will

15  continue to harm Plaintiffs in the future.

16       199.  Because Business Defendants' discriminatory and wrongful conduct is

17  ongoing, declaratory and injunctive relief are appropriate remedies.

18       200. Plaintiffs seek injunctive relief, and attorney's fees, costs and

19  litigation expenses to address these violations.

20

21  THIRD CLAIM: VIOLATIONS OF CALIFORNIA FAIR EMPLOYMENT AND

22     HOUSING ACT, CALIFORNIA GOVERNMENT CODE § 12900 *ET SEQ.*

23       201.  Plaintiffs incorporate by reference the preceding paragraphs.

24       202. Plaintiffs plead this claim against all Defendants.

25       203. The California Fair Employment and Housing Act (FEHA) makes it

26  unlawful to "otherwise make unavailable or deny a dwelling based on

27  discrimination because of...disability." Cal. Gov't Code § 12955(k).

28       204. FEHA further provides that "[a]ll covered multifamily dwellings with

34

1  a building entrance on an accessible route shall be designed and constructed in a
2  manner [that allows] the public and common areas [to be] readily accessible to
3  and usably by person with disabilities." Cal. Gov't Code § 12955(d).

4      205. FEHA further provides that it is unlawful "[f]or any person subject to
5  the provisions of the [Unruh Civil Rights Act] section 51 of the Civil Code … to
6  discriminate against any person" on any basis protected under FEHA. Cal. Gov't
7  Code § 12955(d).

8      206. FEHA further provides that it [i]t is an unlawful practice…for a
9  person to deny or to aid, incite, or consider in the denial of the rights created by
10  Section 51…" Cal. Gov't Code § 12948.

11      207. Defendants provide multifamily housing at St. Timothy's Tower &
12  Manor subject to FEHA.

13      208. Plaintiffs are all individuals with disabilities within the meaning of
14  FEHA.

15      209. Defendants' actions and omissions discriminate against Plaintiffs
16  solely because of their disability in violation of FEHA. Defendants' discriminatory
17  conduct includes but is not limited to repeated failure to maintain accessible
18  features of their building, *i.e.*, operable elevators, failure to implement lawful
19  reasonable accommodation policies, notice policies, and emergency evacuation
20  policies, to ensure that Plaintiffs and others similarly situated have equal access to
21  their housing when the elevators go out of service, and maintaining a policy
22  requiring that Plaintiffs use the stairs when the elevators are out of service.

23      210. Defendants' violations of Section 12900 *et seq.* have harmed and will
24  continue to harm Plaintiffs in the future.

25      211. Plaintiff seeks injunctive relief, and attorney's fees, costs and
26  litigation expenses to address these violations.

27

28

# Fourth Claim: Violations of California Government Code Section 11135

212.  Plaintiffs incorporate by reference the preceding paragraphs.

213.  Plaintiffs plead this claim against the "Business Defendants," namely: St. Timothy's Tower & Manor, Inc., St. Timothy's Preservation LP, St. Timothy's Tower and Manor GP LLC, and Levine Management Group, Inc.

214.  California law affords people with disabilities a right to "equal access" to programs and activities subsidized by state funds; such programs may not discriminate against people with disabilities. Cal. Gov't Code § 11135(a).

215.  State-funded programs may not deny a person the opportunity to participate in, or benefit from, its services and programs. 2 Cal. Code Regs § 11154(a). Such programs must provide effective access that results in an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others. *Id.* § 11154(c). Such programs may not "otherwise limit a person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by" the general public. *Id.* § 11154(g)

216.  Business Defendants receive financial assistance from the State of California sufficient to invoke the coverage of Government Code Section 11135.

217.  At all times relevant to this action, Plaintiffs have been and are qualified individuals with a disability within the meaning of California law. Cal. Gov't Code § 12926.

218.  Business Defendants' acts and omissions discriminate against Plaintiffs solely by reason of their disability in violation Section 11135 and its regulations. Business Defendants' discriminatory conduct includes but is not limited to failure to maintain operable elevators, failure to implement lawful reasonable accommodation policies, notice policies, and emergency evacuation policies, and maintaining a policy requiring that Plaintiffs use the stairs when the elevators are out of service, which denies Plaintiffs effective access to their homes,

and unequal benefit of the programs and services the Business Defendants provide.

219.  Pursuant to California Government Code § 11139, Plaintiffs have a private right of action to enforce California Government Code § 11135(b).

220. Business Defendants' violations of California Government Code § 11135 have harmed and will continue to harm Plaintiffs.

221.  Plaintiffs seek declaratory and injunctive relief as well as reasonable attorneys' fees, costs and litigation expenses to address these violations.

## FIFTH CLAIM: VIOLATIONS OF THE CALIFORNIA UNRUH CIVIL RIGHTS ACT, CALIFORNIA CIVIL CODE § 51 *ET SEQ.*

222. Plaintiff incorporates by reference the preceding paragraphs.

223. Plaintiffs plead this claim against the Business Defendants: St. Timothy's Tower & Manor, Inc., St. Timothy's Preservation LP, St. Timothy's Tower and Manor GP LLC, and Levine Management Group, Inc.

224. The Unruh Civil Rights Act ("Unruh Act") provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their disability [or] medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

225. Business Defendants are business establishments in their operation of the Program under the Unruh Civil Rights Act.

226. At all times relevant to this action, Plaintiffs have been and are qualified individuals with a disability within the meaning of California law. Cal. Gov't Code § 12926.

227. Business Defendants violated the Unruh Act from at least June 2016 through the present as described above.

228. Business Defendants' acts and omissions were by reason of Plaintiffs' disabilities.

229. Business Defendants have been on notice of Plaintiffs' disabilities at least since they became tenants at St. Timothy's. Business Defendants acted either with intent to violate Plaintiffs' rights or with deliberate indifference to those rights.

230. Business Defendants' actions constitute intentional discrimination against Plaintiffs under the Unruh Civil Rights Act. Business Defendants' discriminatory conduct includes but is not limited to failure to maintain operable elevators, failure to implement lawful reasonable accommodation policies, notice policies, and emergency evacuation policies to make provision for the health and safety of tenants with disabilities when the elevators are out of service, and maintaining a policy requiring Plaintiffs use the stairs when the elevators are out of service.

231. As a result of Business Defendants' acts and omissions, Plaintiffs have suffered injuries including, but not limited to, denial of full and equal accommodations, advantages, facilities, privileges, or services in their housing at St. Timothy's Tower & Manor, hardship, pain and suffering, and anxiety.

232. Plaintiffs seek injunctive and declaratory relief as well as attorneys' fees, costs and litigation expenses reasonably expended to remedy these violations.

## PRAYER FOR RELIEF

Plaintiff prays this Court enter judgment as follows:

1. A finding that the Business Defendants—St. Timothy's Tower & Manor, Inc., St. Timothy's Preservation LP, St. Timothy's Tower and Manor GP LLC, and Levine Management Group, Inc—violated Section 504 of the Rehabilitation Act; California Government Code Section 11135; and the Unruh Act.

2. An injunction ordering all Defendants to comply with the Fair Housing Amendments Act and the California Fair Employment and

Housing Act and ordering Business Defendants to comply with
Section 504 of the Rehabilitation Act, California Government Code
Section 11135, and the Unruh Act, including:

    a. Ensuring that Plaintiffs have meaningful access to their housing
and any programs, services, or activities, by taking all necessary
steps to maintain the Tower elevators in operable condition.
This includes at a minimum:

        i. Making any immediate repairs and/or upgrades to the
Tower elevators that are necessary to render a functional
elevator system,

        ii. Maintaining an adequate service agreement for full
preventative maintenance consistent with Title 8, C.C.R.
§ 3000 et seq., Title 24, C.C.R. Chapter 11a and 11b with
an elevator repair service to ensure prompt and regular
maintenance and repairs.

        iii. Paying all licensing fees to keep the elevators
operational; posting current operating certificate in the
elevators; and maintaining a copy of the current elevator
operating certificate for inspection by any tenant,
member of the public, or government official in the
manager's office during regular business hours.

    b. In consultation with Plaintiffs, developing a plan that includes
any policy changes necessary for a durable remedy, including a
yearly schedule for elevator inspection, timely and effective
notice of outages, and a process for responding to elevator
repair requests.

    c. Implementing policies necessary to protect disabled tenants'
health and safety and equal access to their homes when the

1   elevators are out of service, including, *e.g.*, a reasonable

2   accommodations policy, an emergency evacuation policy, a

3   disaster policy, a notification policy, and a temporary rehousing

4   policy.

5       d.  Require any other steps necessary to provide meaningful access

6           for Plaintiffs to St. Timothy's programs, services, and activities.

7   3.  Order reasonable attorneys' fees and costs including, but not limited

8       to, fees, costs and litigation expenses under 29 U.S.C. § 794(b); Cal.

9       Civil Code §52; and Cal. Code Civ. Proc. 1021.5.

10  4.  Such other relief as the Court deems just and proper.

11

12  June 29, 2018                        Disability Rights California,
                                         Attorneys for Plaintiff

13

14                                       _____/s/_____

15                                       By: Srividya Panchalam

16

17

18

19

20

21

22

23

24

25

26

27

28

# JURY DEMAND

Plaintiffs hereby demand trial by jury.

June 29, 2018                              Disability Rights California,
                                          Attorneys for Plaintiff

                                          _____/s/_____
                                          By: Srividya Panchalam

41